**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

---

**MICHELE BAXTER,**

        Plaintiff

**v.**

**PUEBLO SCHOOL DISTRICT 60**

        Defendant.

---

## COMPLAINT

---

COMES NOW Plaintiff, Michele Baxter, and for her Complaint against Defendant, alleges the following:

### Introduction

1.      This is an action brought pursuant to § 504 of the Rehabilitation Act, 29 U.S.C. § 794, for retaliation.

### Jurisdiction

2.      The Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331 & 1343.

### Parties

3.      Michele Baxter is a resident of Colorado Springs, Colorado who was formerly employed by Pueblo School District 60.

4.      Pueblo School District 60 (hereafter "Defendant" or "the District") is a Colorado public school district that operates Pueblo City Schools in Pueblo, Colorado.

5.      At all times relevant to this Complaint, the District received federal funding that supported the District's programs for educating students.

6.      At all times relevant to this Complaint, the District was a "program or activity" that received federal funding.

## Venue

7.      Venue is proper in the U.S. District Court for the District of Colorado as the acts and omissions giving rise to Plaintiff's claim occurred in Pueblo, Colorado.

## General Allegations

8.      Michele Baxter is a dedicated and experienced educator.

9.      Ms. Baxter commenced her employment with the District in 2003.

10.      Ms. Baxter worked as a teacher for many years before transitioning into administrative positions with the District.

11.      While working for the District in administrative positions, Ms. Baxter received one-year contracts for her positions.

12.      Throughout her employment with the District until August 2019, Ms. Baxter's contracts were renewed without question.

13.      Ms. Baxter worked as a district level Special Education Specialist, and a school principal before moving into the position of Assistant Director of Exceptional Student Services in the fall of 2015.

14.      While employed as the Special Education Specialist and then as the Assistant Director of Exceptional Student Services, Ms. Baxter was a primary author of the District's approved Special Education policy and protocol guidance to reinforce practices that comply with federal law governing students with disabilities.

15.     Ms Baxter routinely developed and provided district level professional development to the District's Exceptional Student Services staff and to various levels of district leadership staff on current legal practices and compliance with the Individuals with Disabilities in Education Act ("IDEA").

16.     Ms Baxter was adept at advocating for and resolving issues for students and families in the area of behavioral needs, complex community liaison communications, and incidents of judicial interventions for students identified with serious emotional disabilities.

17.     Ms Baxter was routinely sought out and assigned by administrative leadership to provide intervening support to students, families, community liaisons, and leadership in situations occurring in the district that required interpretation, consultation, and advocacy to sustain the required free and appropriate public education ("FAPE") and IDEA compliance for students identified with disabilities.

18.     Ms. Baxter trained teachers and other District staff on Individualized Education Plan ("IEP") procedures, including how to meet legal expectations in the processes and development of an IEP, as well as how to properly use the district's Infinite campus technology platform to write and maintain the IEP records and communications.

19.     Ms. Baxter reviewed IEP's to ensure that services provided to students aligned with the requirements of a legally compliant IEP.

20.     Ms Baxter routinely advocated for the improvement of continuum of services to meet the educational needs of students in the District under the IDEA.

21.     Ms. Baxter used her work to serve as a voice encouraging accommodation of all students and emphasized that the needs of the student must drive the IEP and any subsequently required accommodations for instructional access.

22.     Ms Baxter initiated and developed practices with the Special Education Leadership team to complete in-house reviews of IEPs, routines to observe and evaluate the practices of the IEP process in the field, and to complete quality control reviews of the District's IEPs.

23.     Ms Baxter routinely communicated to leadership the ongoing need to improve the continuum of District services to meet the full spectrum of educational needs to students under federal law.

24.     Ms Baxter repeatedly advocated that, according to her observations, her interactions with parents, students, staff, and community members, and the program data collected, that the District needed to implement changes in the number of special education teachers, special education support services personnel, and locations of educational services/centers to meet the legal requirements to provide FAPE for students in the District.

25.     In early January 2019, Ms. Baxter was asked to attend a Best Interest Determination ("BID") team meeting for student XP.

26.     A Best Interest Determination ("BID") is a required action in the Every Student Succeeds Act ("ESSA"), 42 U.S.C. § 675(1)(G)(ii).

27.     A BID team was necessary for XP because he was returning to the District from a short and unsuccessful foster care placement located in Pueblo School District 70.

28.     XP is a student with a lengthy, complex history of educational issues that included truancy, community service requirements, family issues, problems riding the bus due to interference with the bus driver, very high non-attendance rates, and multiple unsuccessful discharges from attempted IEP placements in licensed Day Treatment facility schools.

29.     Some of the attendees at the BID team meeting discussed a proposal to provide XP with home-based tutoring to address his schooling needs.

30.     Ms. Baxter advocated that home tutoring would be a greater placement restriction for him and would not meet the placement identification in his current IEP.

31.      Ms Baxter also reminded the team that XP's mother had made it clear she was not in favor of him being at home and having a tutor come to their home.

32.     Ms Baxter advised the BID team that XP's most current IEP had determined a separate school as the least restrictive environment placement.

33.     Ms. Baxter also advised the BID team that because a separate school day was the established least restrictive environment ("LRE") for XP, it would be inappropriate to place XP into home-based tutoring as the placement for his schooling.

34.     Based on Ms. Baxter's explanation to the BID team that XP could not be placed into home-based schooling without a Change of Placement action, the BID team agreed that Ms. Baxter should work to determine the appropriate educational location and supports for XP's current IEP.

35.     Additionally, Ms Baxter agreed to provide XP's mother with the documents under IDEA to complete her request for reevaluation of XP's IEP and to provide required notice of potential forthcoming action following the BID team meeting.

36.     Following the BID team meeting, Ms. Baxter met with Stephanie Johnson, the Director of Exceptional Student Services ("ESS") and the ESS team to determine a location to provide special educational instruction and related services to XP.

37.     Ms. Johnson directed Ms. Baxter to contact Dr. Kim LeBlanc, the District's Executive Director of Secondary Education, who supervised the Heaton and Paragon campuses-to discuss the options for XP.

38.     On January 8, 2019, Ms. Baxter and Dr. LeBlanc met and Ms. Baxter provided background and information about XP's current status and reviewed his current IEP.

39.     Ms. Baxter and Dr. LeBlanc agreed that utilizing the Paragon Campus location with the assignment of the IEP's identified special education and related services would be a sufficient location to provide XP with appropriate educational services to meet FAPE under his current IEP.

40.     Ms. Baxter and Dr. LeBlanc also agreed that the Paragon campus would be a satisfactory option for XP due to Paragon's sheltered setting, small number of students, more availability for security supports, and minimal exposure to peers that were identified as possible triggers for XP's behavioral issues.

41.     The plan to locate XP at the Paragon campus to receive his instruction was to be an interim solution while the BID team, social services, judicial advocates and the ESS team worked toward a solution that might better meet XP's needs.

42.     On January 14, 2019, Ms. Baxter met with staff at the Paragon campus to start the planning process for XP's location move the Paragon campus.

43.     On January 17, 2019, Ms. Baxter facilitated an intake meeting at the Paragon campus with XP, XP's parent, Paragon's principal/staff members, XP's caseworker from the Department of Human Services, and a social worker from the Guardian Ad Litem's Office.

44.     The January 17, 2019 meeting was not an IEP meeting.

45.     The January 17, 2019 meeting dealt with a non-significant change of placement or services.

46.     The January 17, 2019 meeting was an "intake meeting" to start service at the determined location.

47.     Ms. Baxter documented the January 17, 2019 meeting in the contact communication log of the Infinite Campus records keeping platform.

48.     Ms Baxter's actions followed the practices Ms Baxter had previously utilized uniformly in similar situations.

49.     These practices were known and endorsed by Ms. Johnson and the ESS team.

50.     XP started at Paragon during the week on January 21, 2019.

51.     XP's location at Paragon was problematic due to XP's lack of attendance and ongoing behavior incidents.

52.     After his arrival at Paragon, XP displayed violent and noncompliant behaviors.

53.     The Paragon principal, Roanne Collette, told Ms. Baxter that she did not want XP in the school.

54.     On February 4, 2019, Ms. Collette asked Ms. Baxter to come to Paragon to address XP's behavioral issues, which Ms. Baxter did.

55.     Ms. Collette asked Ms. Baxter to keep XP out of school at Paragon on February 6, 2019.

56.     Ms Baxter informed Ms. Collette that as the Principal of the campus she could determine and document the events with XP as a suspension and that Ms. Baxter would support Ms. Collette's actions.

57.     XP attended school on February 11, 2019 without incident.

58.     After XP started at Paragon, but before February 11, 2019, Dr. LeBlanc's employment with the District ended.

59.     Cheryl Madrill replaced Dr. LeBlanc as the Executive Director of Secondary Education on an interim basis.

60.     On February 11, 2019, Ms. Johnson was called to Ms. Madrill's office for a discussion about XP.

61.     Ms Baxter was not invited or notified to participate in the February 11, 2019 discussion between Ms. Johnson and Ms. Madrill concerning XP.

62.     Ms. Madrill did not believe that XP should be placed at Paragon.

63.     Ms. Madrill directed Ms. Johnson to tell Ms. Baxter to remove XP from the Paragon campus immediately.

64.     Ms. Baxter did not agree with Ms. Madrill's opinion about XP's placement at Paragon.

65.     During the February 11, 2019 discussion, Ms Baxter contended that arbitrarily moving XP off of the campus without an education plan would violate XP's rights under the IDEA.

66.     Ms Baxter also detailed her concerns to Ms. Madrill that these actions involving XP would not be welcomed or supported by XP's advocacy team or the truancy Judge.

67.     Ms Baxter informed Ms Johnson that a truancy hearing was scheduled for XP later that week on February 14, 2020.

68.     Ms Baxter continued to make a case to Ms. Madrill, Ms. Morey, and Ms. Johnson that a very clear explanation and plans for school services would need to be in place to meet the Judge's expectations.

69.     During the regularly scheduled ESS Leadership team meeting on Monday, February 11, 2019, Ms Baxter sought communication and confirmation from Ms. Johnson as to how to proceed with the directive from Ms. Madrill's office.

70.     Ms Johnson again told Ms Baxter that the directive was final and that she was to let XP's mother and advocacy team know as soon as possible.

71.     Ms Johnson informed Ms Baxter that Ms. Johnson was required to meet with Ms. Macaluso, the District Superintendent, concerning XP at 4:00 p.m.

72.     Ms Baxter asked to be included in the 4:00 p.m. meeting with the Superintendent, and Ms. Johnson agreed with her request.

73.     At 4:00 p.m., while Ms Baxter was in the waiting room of the Superintendent's office, Ms. Johnson exited the office and told Ms. Baxter that the meeting had already been completed.

74.     On February 11, 2019, consistent with Ms. Madrill's directive. Ms. Baxter notified XP's family and advocates that XP could no longer attend school at Paragon.

75.     After Ms. Baxter sent an email notification to XP's advocates about the decision to remove XP from Paragon, the Department of Human Services made a demand to the District for a written explanation of the reasons why XP was being excluded from Paragon.

76.     XP's Guardian Ad Litem, Morgan DeHaro Brown, threatened to file an IDEA due process complaint against the District because of XP's removal from Paragon.

77.     XP's mother emailed the District expressing her frustration that XP was being denied services and removed from the school.

78.     Ms. Baxter forwarded all communications about XP's removal from Paragon to Ms. Johnson.

79.    On February 12, 2019, Ms. Baxter spoke with Ms. Johnson about the decision to remove XP from Paragon and asked Ms. Johnson again, why XP could not have continued in school at Paragon.

80.    In response to Ms. Baxter's questioning about the removal of XP from Paragon, Ms. Johnson was visibly upset about the situation and confided that she was in the middle of a very "messy situation."

81.    Ms. Johnson told Ms. Baxter she had been reprimanded because of Ms. Baxter's email to XP's team about his removal from Paragon.

82.    Ms. Johnson also told Ms. Baxter that Ms. Baxter certainly should not have emailed XP's advocates about his removal from Paragon and that it "should not have been put in writing."

83.    Ms. Johnson's statements to Ms. Baxter about not sharing information in writing were contrary to Ms. Johnson's prior instructions to Ms. Baxter.

84.    It was an established practice due to ongoing communication issues and confusion with XP's mother, that emailed communications were the standard ongoing practice of communication with all members of XP's advocacy team.

85.    After Ms. Johnson told Ms. Baxter that she should not have put anything about XP in writing, Ms. Baxter reminded Ms. Johnson that XP had a truancy court appearance set for 3:00 p.m. on February 14, 2019 and that Ms. Baxter would not be attending that appearance because she would be attending the Peak Parenting Conference in Colorado Springs.

86.    Although Ms. Baxter was not available to attend XP's truancy court appearance, Ms. Baxter offered to prepare a timeline and points of communication for her colleague Kitty O'Dell to use at the truancy court appearance.

87.     Ms. Baxter also told Ms. Johnson that the District should be prepared at XP's truancy court hearing to explain to the judge why XP was no longer permitted to attend school at Paragon.

88.     Ms. Baxter had appeared before the judge handling XP's truancy case on other occasions and based on her prior experiences with the judge, was concerned that the judge would find fault with the District's handling of XP's educational services.

89.     During the discussion about preparing for XP's truancy hearing, Ms. Baxter told Ms. Johnson that the District's removal of XP from Paragon, a school location where he could receive appropriate services, including his required tutoring sessions, was the factor that drove XP's family and advocates to become upset and threaten to bring a due process complaint against the District.

90.     In this discussion with Ms. Johnson, Ms Baxter maintained that home-tutoring needed to be set up immediately in an attempt to meet XPs educational needs without disruption.

91.     Ms Johnson stated that the budget for home-tutoring teachers continued to be "very limited and an increase would questioned," or words to that effect.

92.     Ms Baxter found this to be another example of the district's continued lack of proper provisions for services under federal law.

93.     Ms. Baxter reiterated to Ms. Johnson that the District needed to set a date on which XP's home school tutoring sessions would start as that would mollify XP's family and advocates and potentially satisfy any inquiries from the judge at the truancy hearing.

94.     Ms. Johnson told Ms. Baxter that she did not know when the District would start XP's tutoring sessions.

95.     Upon hearing that the District did not have a plan to start XP's tutoring, Ms. Baxter expressed her concern to Ms. Johnson that the District's handling of XP's placement and services was driving the process toward a negative or detrimental result.

96.     Ms Baxter continued to have significant concerns about the propriety of the directive to remove XP from the campus per Ms. Madrill's seemingly arbitrary decision.

97.     Ms Baxter and Ms Johnson went to lunch together on February 12, 2019, as they often had, to try to resolve some of the situation concerning XP.

98.     Ms. Johnson agreed with Ms. Baxter that home tutoring for XP should be put in place immediately.

99.     On February 13, 2019, Ms. Baxter and Ms. Johnson worked together to arrange for a tutor for XP; however, Ms. Johnson would not commit to a date on which the tutoring would start.

100.    After working to arrange for tutoring for XP, Ms. Johnson implied that she would need permission from Ms. Madrill and Ms. Morey to use funds for a tutor to meet XP's needs.

101.    February 13, 2019, Ms. Baxter provided information to Kitty O'Dell about XP in advance of XP's truancy hearing on Feb. 14, 2019.

102.    On February 13, 2019, members of the ESS team had a telephone conference with the District's lawyer to address the possible legal ramifications of the events concerning XP.

103.    Ms. Johnson, Ms. Baxter, Ms. Odell and Nicole Minnis were present for the telephone conference with the District's lawyer during which Ms. Baxter discussed her concerns about XP's removal from Paragon.

104.    On February 14 and 15, 2019, Ms Baxter attended the Peak Parent Conference in Colorado Springs as part of her duties with the District.

105.    While Ms. Baxter was attending the conference, she made multiple calls to Ms. Johnson to discuss how she should communicate with XP's team about his tutoring and its start date.

106.    During those telephone calls, Ms. Baxter continued to share her concern that a lack of a tutoring start date would likely create a risk that there would be a period of time in which XP would not be provided with any services.

107.    Ms. Baxter continued to advocate that the lack of tutoring will cause further disruption in XP's services.

108.    Ms. Baxter also told Ms. Johnson that she was concerned that the District would not be able to explain the lack of services for XP to the court at the truancy hearing.

109.    After Ms. Baxter and Ms. Johnson discussed Ms. Baxter's objections to the plan for provision services to XP, Ms. Baxter sent Ms. Johnson an email asking Ms. Johnson to provide the directive to start the tutoring for XP.

110.    Ms. Johnson did not respond to Ms. Baxter's email.

111.    Ms. Baxter received no communication about the outcome of the court hearing or communications for next steps concerning XP.

112.    On February 20, 2019, Ms. Baxter was called to a meeting with Assistant Superintendent Susan Morey, Ms. Madrill, Ms. Johnson, Ms. O'Dell, and Ms. Minnis.

113.    Ms. Baxter was not told what the purpose of the February 20, 2019 meeting was and was immediately barraged with questions about her actions and work in the IEP process for XP.

114.    At the February 20, 2019 meeting, Ms. Morey led the questioning, despite her lack of special education credentials and understanding of the IEP process requirements.

115.    Ms. Morey's lack of knowledge of the IEP process created significant confusion and frustration during the barrage of questioning directed towards Ms Baxter.

116.    Ms. Baxter believed that the tone of the February 20, 2019 was particularly hostile toward her.

117.    During the February 20, 2019 meeting, Ms. Baxter noticed that Ms. Johnson had copies of XP's records, including his IEP, and that she was visibly scrutinizing and marking up the documents.

118.    Ms. Morey questioned Ms. O'Dell and Ms. Minnis about their opinions of how various elements of the XP's IEP should have been completed and documented.

119.    Ms. Baxter then questioned whether the February 20, 2019 meeting was being held to discuss and prepare services for XP's IEP delivery or to question Ms. Baxter's professionalism or actions, and stated that if it was the latter, she would like to reschedule the meeting so she could obtain representation.

120.    In response to Ms. Baxter's suggestion that the meeting be rescheduled so she could obtain representation, Ms. Morey stated that she felt Ms Baxter was being uncooperative and suggested she maintain a different attitude.

121.    During the February 20, 2019 meeting, Ms. O'Dell was asked to summarize the events of the truancy court hearing on February 14, 2019.

122.    Ms O'Dell stated that XP's advocates and the judge were upset with the campus change and the significant interruption in his education.

123.    Ms O'Dell relayed that during the hearing, she explained that the reason XP was being moved from Paragon was because the campus was for middle school aged children and therefore not a good fit for XP.

124.     After hearing Ms. O'Dell's explanation of what she said in court about the reason for moving XP from Paragon, Ms. Baxter shared her concern that this was not honest communication and the move seemed very "arbitrary to her."

125.     Ms. Madrill then irritably responded that the word "arbitrary" should never be used in the discussion of XP.

126.     Late in the afternoon of February 20,2019, Ms Morey contacted Ms. Baxter and directed her to attend a meeting at 9:30 a.m. on February 21, 2019.  No explanation about the reason for the meeting was provided to Ms. Baxter.

127.      During the February 21, 2019 meeting, Ms. Johnson accused Ms. Baxter of not properly filing XP's IEP.

128.     Later in the day on February 21, 2019, Ms. Baxter was notified by the District's Director of Human Resources, Eric DeCesaro, that she was being placed on administrative leave "pending an investigation regarding allegations of inappropriate employee conduct."

129.     Ms. Baxter was not provided with any information about the alleged inappropriate conduct.

130.     The timing of the decision to place Ms. Baxter on administrative leave was intended to prevent Ms. Baxter from appearing in court that afternoon to advocate for XP.

131.     After being placed on administrative leave in an apparent ploy to prevent her from advocating in court for the rights of a student with disabilities, on February 28, 2019 Ms. Baxter filed a complaint with the U.S. Department of Education's Office of Civil Rights ("OCR").

132.     Ms. Baxter informed the District on February 28, 2019 that she had filed a complaint with the OCR.

133.    Although Ms. Baxter was told on February 21, 2019 that she was being investigated, the District took no steps to commence that investigation until March 6, 2019.

134.    The District waited one week after Ms. Baxter filed her complaint with OCR to begin its investigation of Ms. Baxter.

135.    On March 6, 2019, the District hired Lucinda Hundley to conduct the investigation of Ms. Baxter.

136.    When the District hired Lucinda Hundley to conduct this investigation of Ms. Baxter, it indicated that the scope of Ms. Hundley's work was to investigate "allegations of falsifying special education records" and that she had been hired for the purpose of "evaluating and addressing certain personnel matters in anticipation of possible future claims and/or litigation on these issues."

137.    On March 7, 2019, Eric DeCesaro informed Ms. Baxter by email that she would be interviewed by Ms. Hundley on March 11, 2019 and given an opportunity to respond to the allegations against her.

138.    After Mr. DeCesaro emailed Ms. Baxter about her scheduled interview with Ms. Hundley, Shelly Landgraf, an outside investigator working with Pure HR Solutions, emailed Ms. Hundley and Mr. DeCesaro a "to do list for the investigation."

139.    Ms. Landgraf's "to do list" stated that: "Stephanie Johnson, Direction of ESS will be in the HR office Monday, March 11th at 8:30 am to be interviewed.  Stephanie has reviewed the IEP document and will provide you with a statement regarding her concerns."

140.    Ms. Landgraf also noted that "[t]he IEP in question will be available to you as well as Michele's personnel folder."

141.    Ms. Hundley responded to Ms. Landgraf's "to do list" email and requested a copy of the "procedural manual section re developing IEPs and IEP meetings."

142.    Ms. Baxter was a lead author of the procedural manual that dealt with developing IEPs and IEP meetings, including the procedures that pertain to change of placements and amendments.

143.    On March 11, 2019, Ms. Hundley signed her retainer agreement with the District. The retainer agreement states that Ms. Hundley had been retained at the direction of the District's lawyer to conduct an investigation "evaluating and addressing certain personnel matters in anticipation of possible future claims and/or litigation on these issues."

144.    The only personnel matters that could result in possible future claims and/or litigation that the District was anticipating at the time it hired Ms. Hundley were claims or litigation based on Ms. Baxter's complaint to OCR.

145.    The District hired Ms. Hundley to investigate Ms. Baxter in reaction to Ms. Baxter's complaint to OCR.

146.    On March 11, 2019, Ms. Hundley interviewed Ms. Baxter as part of her investigation.  During the interview, Ms. Hundley informed Ms. Baxter that the allegation she was investigating was that Ms. Baxter falsified documents pertaining to XP's IEP.

147.    Ms. Hundley never identified any document(s) that Ms. Baxter allegedly falsified.

148.    Ms. Hundley never confronted Ms. Baxter with any document(s) that were allegedly falsified.

149.    Ms. Hundley never gave Ms. Baxter an opportunity to demonstrate that any document(s) that were presumed to be falsified were, in fact, accurate.

150.    Ms. Baxter never falsified any documents pertaining to XP's IEP.

17

151.    During the March 11, 2019 interview, it was apparent to Ms. Baxter that Ms. Hundley was not as familiar as Ms. Baxter with current IEP processes in the Infinite Campus format, including the change of placement process.

152.    Ms. Hundley had not been provided with documents defining the IEP amendment process or change of placement process.

153.    On March 12, 2019, Ms. Baxter emailed Mr. DeCesaro and Ms. Hundley with instructions on where the documents defining the IEP amendment process or change of placement process could be found so they could be provided to Ms. Hundley.

154.    Ms. Hundley never followed up with Ms. Baxter after March 11, 2019.

155.    After telling Ms. Baxter on February 21, 2019 that she was being investigated and taking no steps to commence that investigation until March 6, 2019, the District continued its attempts to find reasons to take adverse action against Ms. Baxter for her advocacy on behalf of students with disabilities and for her complaint to OCR.

156.    On March 30, 2019, Stephanie Johnson, the Director of ESS, filed a complaint with the District's human resources department accusing Ms. Baxter, her subordinate employee, of creating a hostile work environment.

157.    At the time Ms. Johnson complained that her subordinate employee had created a hostile work environment, Ms. Baxter had been on administrative leave for over five weeks and had not interacted with Ms. Johnson at all during her leave.

158.    As Ms. Johnson was Ms. Baxter's supervisor, she had authority over Ms. Baxter that would have enabled her to counsel or discipline Ms. Baxter for any behavior that Ms. Johnson believed created a hostile work environment.

159.     Ms. Johnson never attempted to counsel or discipline Ms. Baxter for any of Ms. Baxter's behavior that was identified in her hostile work environment complaint.

160.     Ms. Johnson's complaint of a hostile work environment against Ms. Baxter identified four interactions between Ms. Johnson and Ms. Baxter that occurred over a six-month period between August 27, 2018 and February 20, 2019 and included allegations that Ms. Baxter was "defensive" and crumpled a piece of paper.

161.     Throughout the six-month period of time that Ms. Johnson alleged she was subjected to a hostile work environment by her subordinate employee, Ms. Johnson and Ms. Baxter frequently ate lunch together and Ms. Johnson frequently sought Ms. Baxter's advice and counsel on personal issues.

162.     During the six-month period of time that Ms. Johnson alleged she was subjected to a hostile work environment by her subordinate employee, Ms. Johnson had been on a long-term leave of absence from the District for lengthy periods.

163.     Based on Ms. Johnson's behavior toward, and personal interactions with, Ms. Baxter, upon information and belief, Ms. Johnson did not have a good faith basis for making a hostile work environment complaint against Ms. Baxter.

164.     Upon further information and belief, Ms. Johnson made her hostile work environment complaint against Ms. Baxter in order to provide the District with a justification to discipline or terminate Ms. Baxter.

165.     On May 9, 2019, OCR notified Ms. Baxter that it was investigating the complaint she filed in February 2019.

166.     OCR notified Ms. Baxter that it was investigating the following allegations:  (1) the District did not provide a free appropriate public education (FAPE) to students with

disabilities in that it lacked sufficient personnel to implement IEPs, including special education teachers, speech and language pathologists, psychologists and social workers, occupational therapists, physical therapists, and homebound instructors; (2) the District did not place students in the least restrictive environment (LRE) in that the District lacks adequate staff and placement options and therefore special education students in middle and high school are placed in the same class track and segregated from the general education population; and (3) the District makes placement decisions based on the availability of special education staff and school resources and not in conformity with 34 C.F.R. §§ 104.34 and 104.45.

167.    Additionally, OCR was investigating the allegation that the District retaliated against Ms. Baxter when it placed her on administrative leave because she asserted that the District had not provided a FAPE to students with disabilities.

168.    On May 9, 2019, OCR notified Charlotte Macaluso, the District's superintendent, that Ms. Baxter had filed a complaint against the District.

169.    On May 28, 2019, the District prepared a litigation hold notice related to the OCR complaint filed by Ms. Baxter.

170.    On June 4, 2019, Mr. DeCesaro emailed Superintendent Macaluso, Cheryl Madrill, and Shelly Landgraf asking them to confirm that they had received and understand the litigation hold notice.

171.    On August 5, 2019, Superintendent Macaluso sent Ms. Baxter a letter informing her that the District would not renew Ms. Baxter's contract for the 2019-2020 school year.

172.    Throughout Ms. Baxter's tenure with the District, her contracts were always renewed without question.

173.    Pursuant to the terms of Ms. Baxter's employment contract for the 2018-2019 school year, Ms. Baxter could only be discharged by the District's Board for good and just cause.

174.    Pursuant to the terms of Ms. Baxter's employment contract, Superintendent Macaluso did not have the authority to discharge Ms. Baxter.

175.    As the District did not have good and just cause to terminate Ms. Baxter's employment, upon information and belief, Superintendent Macaluso allowed Ms. Baxter's contract to expire in order to cause the termination of Ms. Baxter's employment.

176.    As the District did not have good and just cause to terminate Ms. Baxter's employment, upon information and belief, Superintendent Macaluso allowed Ms. Baxter's contract to expire in order to cause the termination of Ms. Baxter's employment without involving the District's Board in the decision to terminate Ms. Baxter.

177.    As the District did not have good and just cause to terminate Ms. Baxter's employment, upon information and belief, Superintendent Macaluso allowed Ms. Baxter's contract to expire in order to hide the true reasons for Ms. Baxter's discharge from the District's Board.

178.    If the District had good and just cause to terminate Ms. Baxter's employment, upon information and belief, Superintendent Macaluso would have notified the District's Board of the good and just cause supporting the termination of Ms. Baxter's employment so the Board could exercise its authority to discharge Ms. Baxter.

179.    As the District did not have good and just cause to terminate Ms. Baxter's employment, upon information and belief, Superintendent Macaluso made the decision to not renew Ms. Baxter's contract in order to hide her retaliatory motive for discharging Ms. Baxter.

180.     Superintendent Macaluso made the decision to not renew Ms. Baxter's contract in retaliation for Ms. Baxter's advocacy on behalf of students with disabilities.

181.     The non-renewal of Ms. Baxter's contract was a termination of her employment with the District.

182.     The District made the decision to not renew Ms. Baxter's contract because of her advocacy on behalf of students with disabilities.

183.     Ms. Baxter was subjected to unlawful retaliation because of her advocacy on behalf of students with disabilities.

184.     As a result of the actions of Defendant, Ms. Baxter has suffered past and future economic losses, emotional pain, suffering, inconvenience, mental anguish, humiliation, and other non-pecuniary losses.

**FIRST CLAIM FOR RELIEF (Retaliation—Rehabilitation Act, 29 U.S.C. § 794)**

185.     Plaintiff realleges all prior paragraphs and incorporates them herein.

186.     Defendant is a program or activity that received federal funding.

187.     Defendant is covered by § 504 of the Rehabilitation Act.

188.     Section 504 of the Rehabilitation Act prohibits discrimination against students with disabilities.

189.     Section 504 of the Rehabilitation prohibits retaliation against any individual who has opposed acts or practices made illegal by the Rehabilitation Act.

190.     Ms. Baxter opposed discrimination against students with disabilities.

191.     Ms. Baxter advocated for the rights of students with disabilities.

192.     Defendant did not renew Ms. Baxter's contract for the 2019-2020 school year and terminated her employment.

193.    Defendant did not renew Ms. Baxter's contract for the 2019-2020 school year and terminated her employment because of Ms. Baxter's opposition to discrimination against students with disabilities.

194.    Defendant did not renew Ms. Baxter's contract for the 2019-2020 school year and terminated her employment because of Ms. Baxter's advocacy for the rights of students with disabilities.

195.    But for the protected activity that Ms. Baxter engaged in, her employment would not have been terminated.

196.    As a consequence of Defendant's illegal conduct, Ms. Baxter has sustained significant injuries, damages, and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.      Nominal damages;

b.      Reinstatement and back pay, including loss of benefits and seniority, or front pay in lieu of reinstatement;

c.      Nonpecuniary and compensatory damages, including damages for emotional distress and consequential damages;

d.      Pre- and post-judgment interest at the highest rate allowed by law;

e.      Costs and reasonable attorneys' fees; and

f.      All other legal or equitable relief to which Plaintiff is entitled.

## Jury Demand

**Plaintiff requests this matter be tried by a jury.**

Respectfully submitted this 20th day of May, 2021.

CORNISH & DELL'OLIO, P.C.


s/Ian D. Kalmanowitz
Ian D. Kalmanowitz, # 32379
Cornish & Dell'Olio, P.C.
431 N. Cascade Avenue, Ste. 1
Colorado Springs, CO 80903
Telephone:  (719) 475-1204
Fax:  (719) 475-1264
Email:  ikalmanowitz@cornishanddellolio.com
Attorneys for Plaintiff

Plaintiff's Address:
1342 Sunset Road
Colorado Springs, CO 80909